UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA          )
                                  )
            v.                    )
                                  )    CRIMINAL NO. 04-30055-MAP
                                  )
KACEY JONES,                      )
            Defendant             )

## GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS EVIDENCE

### STATEMENT OF ISSUES

On March 22, 2004, at 6:40 a.m., a woman called the
Springfield Police Department to report a man with a firearm who
was dealing drugs from 49 School Street.  The woman further
stated that this armed individual presented an immediate danger
to her friend William Cubi ("Cubi"), the lawful tenant of 49
School Street.  Four Springfield Police officers responded to
this call for assistance.  Cubi opened the back door for the
police after they knocked.  He welcomed them into the apartment
and pointed toward the front of the apartment.  While conducting
a protective sweep of the apartment the police observed the
Defendant through a partially-opened bathroom door.  The
Defendant was holding a large knife.  The police entered the
bathroom and recovered a firearm and numerous bags of crack
cocaine in plain view within the Defendant's reach.  The police
also recovered $490.00 from the Defendant's pocket incident to

1

his arrest.

The issues before this Court are whether the officers' warrantless entry and protect sweep of the apartment were justified by either voluntary consent or exigent circumstances.

### STATEMENT OF FACTS

On March 22, 2004, at 6:40 a.m., a woman called the Springfield Police Department to report that a man with a gun posed an immediate danger to her friend William Cubi inside of Cubi's apartment at 49 School Street in Springfield.[1]  The caller stated that the suspect had recently struck Cubi, and that the suspect was dealing drugs from Cubi's apartment.  The caller provided a detailed description of the suspect to the police operator.

The caller repeatedly said she was frightened, and after she identified herself to the police operator, she asked that her name not be used by the police.  She also advised the operator to caution the responding officers to be careful because the suspect with the firearm was looking out the window. The caller also indicated that the armed suspect may have an accomplice who was looking out for the police.

The police operator categorized this call as needing "immediate assistance" and he dispatched four officers to 49

---

[1]A transcript of this call is attached as Government Exhibit #1.  This transcript will be offered into evidence during the hearing on the Defendant's motion.

School Street.  While Officers Michael Sedergren and Edward
Ganley responded to the apartment's rear door, Officers Michael
Trombley and Sean Collins approached the front door.  William
Cubi opened the back door for Sedergren and Ganley, after they
knocked and announced "Springfield Police."  Cubi identified
himself, stated "come on in," and immediately pointed,
unprompted, toward the front of the apartment.  While Officer
Ganley remained with Cubi, Officer Sedergren quickly proceeded to
the front of the apartment to open the front door for Trombley
and Collins.

The front door opened to a large common room.  Within
seconds of their entry into the front of the apartment, the
officers observed an unidentified male[2] standing in the common
room.  Since this individual did not fit the caller's description
of the suspect with the firearm, the officers frisked him for
weapons and then ordered him to sit on a couch.  Officer Collins
remained with this individual while Sedergren and Trombley began
a protective sweep of the apartment.

As Trombley walked down a hallway, he noticed that the
bathroom door was partially open.  Trombley peered inside the
bathroom and observed the Defendant sitting on the toilet.  The
Defendant was holding a large knife in his hand.  Trombley

---

[2]Although this individual identified himself to the
officers, the officers did not record his name.

immediately realized that the Defendant matched the caller's description of the armed suspect.  Trombley entered the bathroom and ordered the Defendant to drop the knife.  The Defendant dropped the knife, then reached forward toward a large handgun. The gun was partially wrapped in a towel, resting on a towel rack, just a few feet from the Defendant.  Trombley and Sedergren quickly grabbed the Defendant and secured the handgun.

The Defendant struggled with the officers.  Before the officers subdued him, Jones dropped a plastic bag in the toilet. The officers recovered 32 small bags of crack cocaine from this plastic bag.  The police also recovered $490.00 from Jones' pocket.  The firearm, a .45 caliber revolver with a 9 ½ inch barrel, was stolen from New Hampshire in 2003.  There were six rounds of ammunition in the firearm.  Although the Defendant initially provided an alias to the officers, he admitted his true name when the officers told him they had just observed his photograph in conjunction with an arrest warrant.[3]

### SUMMARY OF ARGUMENT

Two well-established exceptions to the warrant requirement – voluntary consent and exigent circumstances - independently justified the officers' entry and protective sweep of the apartment.  The firearm and crack cocaine were recovered in plain

---

[3]The Defendant had an open arrest warrant for a home invasion in which he allegedly shot two individuals.

4

view during this lawful protective sweep, and the U.S. currency
was recovered incident to the Defendant's arrest.  Accordingly,
this Court should deny the Defendant's Motion to Suppress
Physical Evidence.

**ARGUMENT**

1.  **The officers lawfully seized the firearm, crack cocaine, and
    U.S. Currency after receiving voluntary consent to enter and
    conduct a limited search of the apartment.**

Cubi voluntarily consented to the officers' entry into and
the ensuing limited search of his apartment.  Whether consent is
voluntary is to be determined by examining the totality of the
circumstances, including the interaction between the police and
the person alleged to have given consent.  United States v.
Perez-Montanez, 202 F.3d 434, 438 (1st Cir. 2000).  This Court
should scrutinize Cubi's recent claim, as set forth in the
affidavit submitted by the Defendant, that he did not give
consent to the officers to enter and secure his apartment.  The
analysis into the voluntariness of Cubi's consent starts with the
caller's report to the police that her friend Cubi was in danger.
The caller, who had just left Cubi's side, said she was certain
he would cooperate with the police.  When the police operator
asked the caller if Cubi would let the police in the apartment if
they knocked on the door, she exclaimed, "yes, oh yes!"[4]  The
fact that so many details provided by the caller were eventually

---

[4]See Government's Exhibit #1, p.2.

5

corroborated by the police supports the caller's assessment that Cubi was in danger and that he wanted police assistance.

Consistent with the caller's assurances Cubi would be cooperative, the officers will testify they entered the apartment only after Cubi opened the door for the police, at 7:00 a.m., without expressing surprise, or dismay, with their arrival. It was obvious to the officers that Cubi expected them. After stating, "come on in," Cubi authorized a protective sweep of his apartment by immediately pointing to the area of the apartment where the officers encountered the Defendant. Cubi's reaction to the officer's arrival clearly amounted to consent to enter and secure the apartment even absent explicit permission. See United States v. Zapata, 18 F.3d 971, 977 (1st Cir. 1994) (evidence of an individual's consent to search the trunk of a car inferable when individual relinquished car keys to the police) citing Schneckloth v. Bustamonte, 412 U.S. 218 (1973); Robbins v. MacKenzie, 364 F.2d 45, 48 (1st Cir. 1966)(same).

Cubi's invitation to the officers to enter his apartment was not in response to police coercion. For example, the government expects the officers to testify that they did not announce to Cubi that they were going to search his apartment without his consent. See United Stated v. Weidul, 325 F.3d 50, 53 (1st Cir. 2003). Any insinuation that Cubi's will was overborne by the police presence would be undermined by a review of Cubi's

6

criminal history.  The evidence will show that he has been convicted of numerous felonies and that he has more than forty entries on his criminal record.  In light of his history, it is unlikely Cubi would have been intimidated by the police presence in his apartment.  See, e.g. United States v. Barnett, 989 F.2d 546, 556 (1st Cir. 1993).

Cubi's reluctance to admit he gave consent to the officers is not surprising considering the evidence the government has uncovered of the Defendant's attempt to intimidate Cubi, and to punish him for cooperating with the police.  For example, the government will present evidence that the Defendant had the following exchange with his brother during a recorded telephone call from jail made on March 25 (three days after his arrest):

> The Defendant:  Wreck Cubi.  Wreck Cubi. Go straighten that shit with Cubi, yo.
>
> His Brother:    All right brother.
>
> The Defendant:  He sent police to come get me.  Go straighten that shit.
>
> His Brother:    All right brother.[5]

The Defendant instructed his brother to set Cubi straight after learning, erroneously, that Cubi called the police on the morning of his arrest.  A few weeks after the Defendant had the above conversation with his brother, Cubi told the police that the

---

[5]See Government Exhibit #2, Transcript of Telephone Call, p.4.

Defendant's friends and/or family had threatened and harassed him because they blamed him for calling the police on the Defendant.[6]

In August of 2004, Cubi told Detective Shink that he voluntarily let the police enter and search his apartment because he had nothing to hide. Although Cubi told Detective Shink that the Defendant "took over" his apartment, he also repeatedly stated "Kacey is my friend. I don't want to see him get in trouble." When Cubi learned the government was proceeding against the Defendant, he became evasive. He said he could not remember the Defendant's name. He also revised his earlier statement concerning the officers' entry by stating he had no choice but to open the door because the police were knocking really hard, and they began searching upon their entry into the apartment.

The government anticipates the evidence will reveal that Cubi received cocaine from the Defendant in exchange for allowing the Defendant to deal cocaine from his apartment.[7] Eventually the

---

[6]On March 26, 2005, the Defendant, in a recorded telephone conversation, asked his girlfriend, "Did they straighten that shit with Cubi?" The girlfriend replied that the Defendant's mother reported overhearing the Defendant's brother stating that he was going to get somebody that ratted on his brother. Government's Exhibit #2, p. 5.

[7]The government does not contest the Defendant's standing to suppress the government's evidence since the tenant of the apartment, William Cubi, initially invited the Defendant to stay as a guest. See Minnesota v. Olson, 495 U.S. 91, 96-97 (1990); United States v. Aguirre, 839 F.2d 854 (1st Cir. 1988).

8

Defendant took control over the apartment and became physically
abusive towards Cubi.  It became obvious to Detective Shink
during his interviews of Cubi that Cubi did not want to be
labeled as an informant.  Shink has learned that Cubi is often
homeless and he believes Cubi would be extremely vulnerable on
the street if he were to be labeled as a snitch.  Cubi's recent
account to the Defendant's investigator is a fabrication made
more than one year after he welcomed the officers' assistance
from a dangerous situation.

        The officers' protective sweep of Cubi's apartment was not
overly intrusive.  The officers properly limited the scope of the
search to where an individual could be hiding.  See United States
v. Lopez, 989 F.2d 24, 27 (1st Cir. 1993)(exigent circumstances
justified the officers' search for weapons in an opening in the
ceiling of a bathroom); United States v. Irizarry, 673 F.2d 554,
558 (1st Cir. 1982) (exigent circumstances justified search of
hotel room after an armed individual exited the room); see also
Maryland v. Buie, 494 U.S. 325, 327 (1990) (protective sweep,
incident to arrest, should be "narrowly confined to a cursory
visual inspection of those places in which a person might be
hiding.").  The fact that less than two minutes elapsed from the
time the officers entered the apartment until the time the
officers encountered and arrested the Defendant strongly
indicates that the impetus for the search was safety, not

                                    9

evidentiary.  <u>See</u> <u>Crooker v. Metallo</u>, 5 F.3d 583, 585 (1st Cir.
1993); <u>Lopez</u>, 989 F.2d at 27; <u>Irizarry</u>, 673 F.2d at 558; <u>Buie</u>,
494 U.S. at 328 (a protective search must be a quick and limited
search of premises).  When Officer Trombley encountered an
individual fitting the description of the suspect with a firearm,
Trombley was justified in approaching and frisking the Defendant
in the bathroom especially since Trombley observed him holding a
knife.  <u>Terry v. Ohio</u>, 392 U.S. 1, 22-24 (1968).

**2.  The caller's detailed report of a man with a firearm who was dealing drugs and posing a threat of harm to a named individual provided a reliable basis for the officers to conclude exigent circumstances existed inside the apartment.**

When considering the legality of this search, the Court
should evaluate the source of the information that led the police
to that apartment.  The emergency caller should be deemed
presumptively reliable because she was an identified, percipient
witness to the imminent danger and the crimes being committed.
The caller's detailed report to the police  provided a sound
basis for protective sweep, and a portion of the caller's
information - the fact that William Cubi lived at the apartment -
was immediately corroborated when William Cubi opened the door
for the police and identified himself.  <u>United States v. Soule</u>,
908 F.2d 1032, 1039 (1st Cir. 1990) (Court deemed officer's
contemporaneous corroboration of the informant's factual
statements to be significant factor toward probable cause

10

determination).  Cubi's demeanor and conduct further supported
the reliability and urgency of the caller's information by
indicating to the experienced officers that something was amiss
in the apartment.  See United States v. Martins, 413 F.3d 139,
147-48 (1st Cir. 2005); see also United States v. Khounsavanh,
113 F.3d 279, 284 (1st Cir. 1997).

The Defendant's assertion that the caller appeared
intoxicated is contradicted by a review of the recording.  The
caller, while obviously frightened, remained coherent and
responsive – answering numerous questions appropriately during
the call that lasted approximately six minutes.  The caller was a
concerned citizen who identified herself and provided first-hand
information - including a detailed physical description of the
suspect - that a crime was occurring at a specific location.
United States v. Scalia, 993 F.2d 984, 987 (1st Cir. 1993)(Court
held that an anonymous concerned citizen's detailed information
to police amounted to probable cause).

The officers' entry and limited search of Cubi's apartment
were reasonable and justifiable under the "exigent circumstances"
exception to the warrant requirement.  See Katz v. United States,
389 U.S. 347, 357 (1967) citing Warden v. Hayden, 387 U.S. 294,
298-99 (1967).  This doctrine permits officers to conduct a
warrantless search if they reasonably believe emergency
circumstances would imminently lead to any of the following

11

situations: (1) the risk of harm to officers or the general
public; (2) the destruction of evidence; (3) a risk of flight; or
(4) "hot pursuit" of a fleeing felon.  United States v. Beaudoin,
362 F.3d 60, 66-67 (1st Cir. 2004), cert. denied, 125 S.Ct 484
(2004) citing Bilida v. McCleod, 211 F.3d 166 (1st Cir. 2000)
(Court held that warrantless search by police was justified by
"imminent threat to the life or safety of the public, police, or
a person in a residence.").

        Here, the experienced responding officers reasonably
believed, based on the emergency call for assistance, and Cubi's
demeanor, that (1) the apartment at 49 School Street harbored an
individual who posed an immediate danger to the occupants of the
apartment and the officers themselves, and (2) the risk of harm
compelled immediate action by the officers.  Martins, 413 F.3d at
147 citing Beaudoin, 362 F.3d at 66; See United States v. Lawlor,
406 F.3d 37, 41 (1st Cir. 2005) (911 call reporting an
altercation between two men involving a firearm supported a
warrantless sweep of the house after the men were detained
outside the apartment); Beaudoin, 362 F.3d at 66-67.

        It is significant that Cubi did not ask the officers why
they wanted to enter his apartment.  Instead he greeted the
police by saying "come on in," and he gestured, unprompted by the
officers, to the front of the apartment (the area in which the
Defendant was found).  His conduct corroborated the caller's

information, adding to the exigency. See United States v.

Romaine, 393 F.3d 63, 72 (1st Cir. 2004), cert. denied, 125 S.Ct

2924 (2005) ("The fact that this [confirming that an armed man

was inside] was done by a nod rather than by a declarative

statement does not divest it of significance; the woman's gesture

provided face-to-face corroboration of the essence of the 911

report, and her unwillingness to vocalize lent credence to the

possibility that she faced some kind of threat that inhibited her

from speaking aloud.")

The circumstances - namely the caller's detailed description

of a crime in progress and the officers corroboration of certain

facts upon their arrival at Cubi's apartment - also amounted to

probable cause that a crime was being committed by the time the

officers entered the apartment. See United States v. Pardue, 385

F.3d 101, 106 n.2 (1st Cir. 2004), cert. denied, 125 S.Ct. 1353

(2005) (Court noted that probable cause likely existed after

police stopped an individual who matched the caller's description

of the suspect in an assault); Scalia, 993 F.2d at 987-88.

## 3.    The officers lawfully seized the firearm, knife, and cocaine in plain view.

The officers were entitled to seize the firearm, knife, and

the cocaine because they observed the items in plain view.

United States v. Daoust, 916 F.2d 757, 758 (1st Cir. 1990) citing

Harris v. United States, 390 U.S. 234 (1968).  The officers

lawfully seized the U.S. Currency from the Defendant's pocket

13

incident to his arrest.  <u>United States v. Meade</u>, 110 F.3d 190,

199 (1st Cir. 1997) citing <u>United States v. Uricoechea-Casallas</u>,

946 F.2d 162, 165 (1st Cir. 1991).

## CONCLUSION

For these reasons, the government respectfully requests this

Court to deny the Defendant's motion.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By:

Paul Hart Smyth
Assistant U.S. Attorney

CERTIFICATE OF SERVICE

Hampden,  ss.

Springfield, Massachusetts
September 2, 2005

I, Paul Hart Smyth, Assistant U.S. Attorney, do hereby certify that I have served a copy of the foregoing to Attorney Mark Mastroianni, 95 State Street, Springfield, MA.

Paul Hart Smyth
Assistant U.S. Attorney

15

GOVERNMENT
EXHIBIT
1

TRANSCRIPT FOR THE FOLLOWING TELEPHONE CALL:

Date/time: March 22, 2004 at 6:41 am
Participants:  911 caller (Rodriguez) and unidentified police
operator


Springfield Police: Springfield Police

911 Caller:    Um, Yes, hi good morning.  Umm, I'm calling for a
               friend, a friend of mine.  He told me, you know
               what I'm saying, to call you.  But I have a little
               fear here because it's kind of.. it's kind um..
               something you know something crazy.  Because if
               you find a weapon.. and um.. I don't want my name
               to be put out but Im just scared for him.  I';m
               calling from 32 High Street where I'm at...  But
               the guy.. it's um, 49 School Street 3rd floor to
               the right (unintel) OK.  It's a, it's a black guy,
               right?  And, um, he's been there for a while ..
               hanging in that apartment for a while, it's my
               friend's apartment.  But um, you know, I guess
               he's trying to take over because um..he sells his
               drugs (unintel).. he wants to take over...
               (unintel) he um, he hit him, he hurt him last
               night.  You know?  And um, I called you guys
               because I was the only one there so he would, he
               would know that it was me.  So, he's there right
               now, the black guy is right there, he's sitting
               right there, in the room, with a gun on his waist,
               but he's also (unintel) by the window looking out
               (unintel) because (unintel) because you know?  He
               told me uh, if I was, if I was to go out (unintel)
               I said look, I don't need to call the police
               (unintel) but now I went back to (unintel) see my
               friend.  The guy is still there (unintel) showed
               me his weapon, and I'm scared, officer, I'm really
               scared.

OPERATOR        So what's the address?

911 Caller      The address is 49 School Street, it's on the third
               floor to the right but you know, he's in the
               window but he has a few guys...  the drugs, the
               drugs (unintel).. he has a few guys checking out
               for you guys, like so (unintel) gotta go through
               the front and back, you'll catch him. I don't want
               my name involved (unintel) 'cause then (unintel).

-1-

OPERATOR      Who's your friend?

911 Caller    My friend?  His name is William Cubi.

OPERATOR      Now, he's the complainant?

911 Caller    Yeah, he is (unintel) he's in the apartment there,
              (unintel) he don't dare move to go nowhere
              (unintel)

OPERATOR      What's William's last name?

911 Caller    Excuse me?  Cubi, Cubi, C-U- ah... C-U-B-I.  I'm
              so nervous officer.  Oh god.

OPERATOR      OK now and you are who now?

911 Caller    I am Maria Rodriguez.

OPERATOR      And you're calling on behalf of William Cubi?

911 Caller    I'm calling for him (unintel) but Officer, I don't
              want my name in there please.

OPERATOR      I'm not putting it in there.  OK, so let me see if
              this is straight.

911 Caller    OK.

OPERATOR      You're calling about a black male.

911 Caller    Yes, black male.

OPERATOR      He's sitting in his apartment at 49 High to the
              right, a gun in his waist band, and it's not a
              friend of Mr. Cubi's.

911 Caller    No.  He um (unintel) Cubi's but (unintel) but this
              kid I guess came out, came out a jail recently.
              So he wanted to you know, (unintel) wants to sell
              some drugs from there and uh, my friend (unintel),
              he gave him permission to (unintel) a few dollars.
              Not... to get him in trouble, I know that, and
              uh,.

OPERATOR      And my question to you m'am, if the cops knock on
              the door is Mr. Cubi gonna let them in?

911 Caller    Yes, oh yes, but like I said .. he's in the

-2-

window...

OPERATOR        How old is this black male?

911 Caller      Um, I really don't know, but he's about in his 21,
                22.  He's young, he's young.

OPERATOR        What's he wearing, you know?

911 Caller      (Unintel) Oh my god, he's wearing like blue jeans,
                he's wearing, a blue like, ... like, um your kind
                of jacket, like you guys clothing, dark blue like
                silky jackets (unintel).  Got a hoodie but
                (unintel) a black hoodie.

OPERATOR        OK, and then what? A dark hood.

911 Caller      Excuse me?

OPERATOR        (Unintel) and a dark hood.

911 Caller      I didn't hear that.

OPERATOR        A hoodie underneath?

911 Caller      A hoodie underneath his jacket, yes.  He's chubby,
                short.

OPERATOR        How much does he weigh?

911 Caller      (unintel) I would say like about maybe 200 ...
                he's  heavy.

OPERATOR        200 pounds?

911 Caller      Yeah.

OPERATOR        OK.

911 Caller      Thank you officer like I say, you gotta be really
                careful because they checking out for you guys,
                you know?

OPERATOR        Yup.

911 Caller      OK, thank you officer, bye bye.



**KACEY JONES**
**Telephone calls from jail**

CALL 1 (March 25, 2004)

| | |
|---|---|
| JANE DOE: | Hello. |
| OPERATOR: | Hello, this is a collect call from KC who is an inmate incarcerated at the Hampden County Correctional Facility, Hampden County Massachusetts.  To accept charges press 0, to refuse charges.  This call is subject to monitoring and recording.  Thank you for using Evercom. |
| KACEY JONES: | Hello. |
| JANE DOE: | Hi baby. |
| KACEY JONES: | Fucking niggers jumped me today. |
| JANE DOE: | Today? |
| KACEY JONES: | Yeah. |
| JANE DOE: | Again? |
| KACEY JONES: | Unintelligible. |
| JANE DOE: | I love you. |
| KACEY JONES: | I love you too. |
| JANE DOE: | I miss you. |
| KACEY JONES: | What are we going to do about this babe? |
| JANE DOE: | What? |
| KACEY JONES: | How long you gonna stick around for? |
| JANE DOE: | Huh? |
| KACEY JONES: | How long you gonna do this for? |
| JANE DOE: | Baby, I'm here. |
| KACEY JONES: | This could be a long time.  You see the charges? |

1

JANE DOE:        Yeah, you was here.

KACEY JONES:     I know, but then what about the other shit I got
                 caught with?

JANE DOE:        What did you get caught with?

KACEY JONES:     I got caught with the gun and the coke.

JANE DOE:        On you?

KACEY JONES:     In the fucking house, unintelligible.

JANE DOE:        Unintelligible why the fuck are they saying in the
                 newspaper that them people called the police on
                 you.

KACEY JONES:     Who?

JANE DOE:        Whoever house you was in, saying they had an
                 unwanted guest.

KACEY JONES:     Yeah?

JANE DOE:        Yeah.  So fuck them people and their fucking
                 house.  Did it have your fingerprints on it?

KACEY JONES:     Sh..I don't know.  I don't even know...
                 [unintelligible]

JANE DOE:        Well, shit, fuck 'em.  That shit was in their
                 fucking house.  Baby, for whatever, I'm here with
                 you.  I told you, I told you I would be there with
                 you.  I'm not going nowhere.

. . . . . . . . .
                 [Inaudible]

KACEY JONES:     Yeah.

JOHN DOE:        Aah.

KACEY JONES:     Hey, yo, and that nigger Cubi set me up.

JOHN DOE:        Cubi set you up?

KACEY JONES:     Yeah, he brought the police straight to the
                 fucking house.

2

JOHN DOE:       You got paperwork saying that shit?

KACEY JONES:    It was in the paper.

JOHN DOE:       Yeah they said they responded to a 911 call.

KACEY JONES:    Baby, what did we read in the ...

JANE DOE:       [Unintelligible]... it was an unwanted guest.

JOHN DOE:       Right they responded to a 911 call.

KACEY JONES:    Unwanted guest [unintelligible]  Unwanted guest.
                They let everybody go.  There was crack on the
                kitchen table with pipes and all they came for is
                me.  They let everybody go, yo.

JOHN DOE:       What did they say about.. they charge you with
                that gun?

KACEY JONES:    Yeah man.

JOHN DOE:       That's Cubi's shit man.

JANE DOE:       Mmm hhh

JOHN DOE:       That's his shit man, period.  Did they find it in
                your pocket on you or they found it in the
                bathroom?

KACEY JONES:    They found it in the bathroom wrapped in a towel.

JOHN DOE:       Huh?

KACEY JONES:    They found it in the bathroom wrapped in a towel.

JOHN DOE:       And where was you at?  Inside the bathroom?

KACEY JONES:    Yeah.

JANE DOE:       So what.  I mean unintelligible.

JOHN DOE:       Word up. Yo.

KACEY JONES:    Yeah.

JOHN DOE:       So, what are they trying to say about your
                probation and shit?

3

KACEY JONES:    I didn't hear about that yet, but do you know if
                that nigger Josetta (sp?) is walking around?

JOHN DOE:       Who?

KACEY JONES:    Josetta.

JOHN DOE:       Did I see him walking around?

KACEY JONES:    Do you know if he's alive, out of the hospital or
                what?

JANE DOE:       He's out of the hospital, I heard.

JOHN DOE:       I ain't .... I never knew, I never knew how the
                kid looked [unintelligible].  I only know..

JANE DOE:       When Megan(sp?) go to work tomorrow I'll have her
                check and make sure he's out.

JOHN DOE:       Yo.  Listen.  Your brother right here.

KACEY JONES:    Alright.  Let me talk to him.

JOHN DOE:       Yeah, hold on.

JOHN DOE:       Hold on boss.

KACEY JONES:    Yeah.

JOHN DOE #2:    Yo.

JANE DOE:       Get your ass home.

KACEY JONES:    Yo

JOHN DOE #:     Yo

KACEY JONES:    Hey, wreck Cubi, wreck Cubi...yo,  go straighten
                that shit with Cubi, yo.

JOHN DOE:       Alright brother.

KACEY JONES:    Yo. He sent police to come get me.  Go straighten
                that shit.

JOHN DOE #:     Alright.

4

KACEY JONES:     Alright baby. You alright?

CALL 2 (March 26, 2004)

JANE DOE:        Bring the chair back in for your sister, OK?
                 Bring the chair back in for your sister.

KACEY JONES:     Hey did they straighten that shit with Cubi?

JANE DOE:        I don't know.  Your mother seen your brother...
                 walking in the house yesterday talking about he's
                 going to get somebody that ratted on his
                 brother...

KACEY JONES:     That's what he said?  Will you ask him about that
                 [unintelligible].

JANE DOE:        OK.  Just call me tomorrow right?

KACEY JONES:     Unintelligible.

JANE DOE:        Bye.

5